# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LAURA BLANKENSHIP, as Co-Personal Representative and a Legal Heir of the Estate of Alexander L. Mandarino; and LAMONT MANDARINO, as Co-Personal Representative and a Legal Heir of the Estate of Alexander L. Mandarino, | Case No. 2:14-CV-00281-EJL-REB **MEMORANDUM DECISION AND ORDER** |

                                    Plaintiffs,

          v.

TODD McDEVITT, individually; ADAM
DURFLINGER, individually; and
SHOSHONE COUNTY SHERIFF'S
DEPARTMENT,

                                    Defendants.

## INTRODUCTION

Pending before the Court in the above-entitled matter is the Defendants' Motion for Summary Judgment and related Motion in Limine. The parties have filed their responsive briefing and the matters are ripe for the Court's consideration. Having fully reviewed the

MEMORANDUM DECISION AND ORDER

record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On June 12, 2013, police dispatch received a 911 call from a motorist reporting a possible accident involving a red passenger vehicle that may have gone off the road near mile marker 73 or 74 on interstate 90, near the top of Lookout Pass in north Idaho. This information was relayed to Shoshone County Sheriff's Office (SCSO) Deputy Adam Durflinger who responded to the call.

Deputy Durflinger soon came upon an orange-colored Toyota Scion parked in a large turnout area and noticed the jersey barrier in the middle of the interstate, near the turnout, looked as if it had been hit. At approximately 11:05 a.m., Deputy Durflinger parked his patrol vehicle behind the Scion, informed dispatch of his location, and called in the Scion's license plate number and description. Deputy Durflinger observed some damage to the left rear of the vehicle. Upon approaching the Scion, Deputy Durflinger saw

---

1 Throughout the parties' statements of facts, summary judgment briefing, and supporting materials, they "dispute" the facts as stated by the opposing party. (Dkt. 51, 56, 57, 58, 60, 61.) Generally the parties disagree with the characterizations of the facts made by the other side. The parties also "dispute" certain statements of fact because the other party has made legal arguments as purported "statements of fact." The Court has looked to the underlying evidence cited by the parties to determine whether there is a material dispute of fact; in particular the deposition transcripts, dash-cam video, and affidavits. For the most part, the underlying facts themselves, i.e. what happened at the scene, are not in dispute.

MEMORANDUM DECISION AND ORDER

a male sleeping in the front passenger seat. Because there was not enough damage to the vehicle to indicate it had hit the barrier, Deputy Durflinger concluded the person in the Scion had just pulled over to sleep and he decided to return to his patrol car and clear the scene.

Dispatch then notified Deputy Durflinger that the license plates on the Scion returned to a different vehicle. At 11:07 a.m., Deputy Durflinger activated his dash camera and returned to the Scion to make contact with the occupant and determine who the registered owner of the vehicle was and what license plates should be on the vehicle. (Dkt. 51-6, video exhibit.) When the Deputy knocked on the driver's side window he smelled marijuana. The occupant of the Scion awoke and Deputy Durflinger asked for the vehicle's registration. The individual opened the lower glove compartment and responded that he could not find the registration but was able to produce a receipt with the Scion's VIN but no license plate number. The individual told the Deputy that he had recently obtained the vehicle and offered his Montana driver's license which identified him as 26 year old Alexander Mandarino.

Deputy Durflinger confirmed that the VIN from the receipt matched the Scion's VIN and then returned to his patrol vehicle to run the driver's license and VIN through dispatch. While Deputy Durflinger was waiting for dispatch in his patrol vehicle, Mr. Mandarino exited the Scion and approached the patrol vehicle to ask the location of the nearest restroom. The Deputy answered his question and Mr. Mandarino walked back

MEMORANDUM DECISION AND ORDER

towards the Scion and stood beside the vehicle while he used his cell phone. At 11:14 a.m., Dispatch responded that the driver's license was valid and that the VIN identified the owner of the Scion as Mark Potratz. Idaho State Police (ISP) Trooper Todd McDevitt was driving his patrol car in the area and had overheard SCSO dispatch's response that the license plates did not match the vehicle. Trooper McDevitt radioed Deputy Durflinger to ask if he would like assistance. The Deputy affirmed the request and Trooper McDevitt proceeded to the scene.

Deputy Durflinger returned to the Scion to inquire of Mr. Mandarino regarding who owned the Scion. Mr. Mandarino stated the car belonged to his friend Stephen Potratz. Because the first names did not match and the license plates were incorrect, Deputy Durflinger inquired further of Mr. Mandarino who was unable to provide a reason for the discrepancies. At 11:17 a.m., the Deputy asked Mr. Mandarino to call Stephen for an explanation regarding the license plates.

Trooper McDevitt arrived on scene at approximately 11:19 a.m. and proceeded to asked Mr. Mandarino if he had the vehicle's registration and about the incorrect license plates. The Trooper further inquired about Mr. Mandarino's travel route, timeline, and the owner of the vehicle. Mr. Mandarino stated that he had left Cle Elum, Washington, approximately 288 miles from his current location, at 8:00 a.m. that morning. Trooper McDevitt responded that it was impossible for him to have traveled that distance in that amount of time. Both officers thought Mr. Mandarino's responses to their inquiries were

MEMORANDUM DECISION AND ORDER

contradictory. (Dkt. 51-2 at ¶ 32.)

Trooper McDevitt asked Mr. Mandarino to again look for the vehicle's registration and all three went over to the Scion. Mr. Mandarino reached through the passenger window into the lower glove box and located the registration, which the Deputy noted was the same place Mr. Mandarino had looked in before and stated he could not find the registration. At this time Trooper McDevitt also smelled marijuana coming from the vehicle. The officers noted Mr. Mandarino appeared to be blocking the officers' view inside the vehicle with his body while he retrieved the registration. (Dkt. 51-3 at ¶ 32) (Dkt. 51-4 at ¶ 25.) Trooper McDevitt inquired further of Mr. Mandarino regarding the vehicle's registration, owner, and incorrect plates as well as Mr. Mandarino's travel route.

The officers conferred regarding their observations of Mr. Mandarino's behavior and conflicting statements, the inconsistencies with the vehicle's registration and license plates, and that they had both smelled marijuana. (Dkt. 51-3 at ¶ 19) (Dkt. 51-4 at ¶ 25.) At 11:27 a.m., Trooper McDevitt returned to his patrol car to run the driver's license and VIN through ISP Control while Deputy Durflinger asked Mr. Mandarino further follow up questions. ISP Control confirmed the license plates displayed on the Scion, 717564A Montana, belonged on a 1985 Mercedes that was registered to Mr. Mandarino of Whitefish, Montana and gave the correct license plate number for the Scion, 7C6954B Montana. ISP Control also notified the Trooper that Mr. Mandarino's license was suspended out of Washington for failure to appear on unpaid tickets.

MEMORANDUM DECISION AND ORDER

Between 11:36 a.m. and 11:38 a.m., Trooper McDevitt confronted Mr. Mandarino with the information that his license was suspended and that the license plates displayed on the Scion were registered to his 1985 Mercedes. Mr. Mandarino stated he had swapped the plates on the cars to take a trip to Seattle, Washington. Trooper McDevitt again inquired of Mr. Mandarino about his inconsistent statements concerning his time of travel. The officers stepped away and again conferred during which Mr. Mandarino approached the officers asking if he could drive back to Montana and to use the restroom. Mr. Mandarino also expressed confusion over his driver's license suspension stating he had paid a find in Montana that he believed resolved the issue and that he would clear things up with the Washington fine. Trooper McDevitt noticed Mr. Mandarino appeared to be very nervous. (Dkt. 51-3 at ¶ 29.) Deputy Durflinger also observed that Mr. Mandarino was increasingly nervous during the exchange but that he did not appear to be impaired or intoxicated. (Dkt. 51-4 at ¶ 37.)

The Trooper informed Mr. Mandarino that they could not allow him to drive on the suspended license and with fictitious license plates to which Mr. Mandarino stated "Well, I have the other plates in the car if you want to come see them." (Dkt. 57 at 7, ¶ 20.) The officers agreed and three individuals again returned to the Scion. At approximately 11:46 a.m., Mr. Mandarino opened the front passenger door of the Scion and reached behind the passenger seat to retrieve the correct license plates while the officers stood behind him. He then gave those license plates to Trooper McDevitt who confirmed that they appeared to be

MEMORANDUM DECISION AND ORDER

the license plates registered to the Scion. Trooper McDevitt placed the license plates back inside the vehicle through the open passenger door.

At approximately 11:47 a.m., the Trooper asked Mr. Mandarino about the smell of marijuana coming from the Scion. (Dkt. 57 at ¶ 19.) Mr. Mandarino admitted to having a small amount of marijuana in the car and stated he had a medical marijuana card from Montana for anxiety but that he did not have it with him. (Dkt. 57 at ¶ 19.) Trooper McDevitt told Mr. Mandarino that Idaho does not recognize medical marijuana cards from other states. Shortly thereafter, at approximately 11:47:45 a.m., the Trooper asked Mr. Mandarino to step back from the Scion. (Dkt. 57 at ¶ 32.) Mr. Mandarino responded with a question. Trooper McDevitt again asked him to step away from the vehicle. Mr. Mandarino asked another question about cell service which the Trooper answered. Trooper McDevitt again ordered Mr. Mandarino to move away from the car. (Dkt. 57 at ¶ 32.) Instead of complying, at 11:48:07 a.m., Mr. Mandarino sat down in the passenger seat of the Scion. (Dkt. 57 at ¶ 33.) Trooper McDevitt told Mr. Mandarino to step out of the vehicle. Mr. Mandarino did not comply. Trooper McDevitt twice more ordered Mr. Mandarino out of the vehicle. Mr. Mandarino did not exit the vehicle.

During this time, Trooper McDevitt asked Mr. Mandarino to produce the marijuana he had told the Trooper was in the vehicle at which point Mr. Mandarino opened the upper glove compartment in the Scion. (Dkt. 57 at ¶ 33) (Dkt. 61, Ex. A, Oct. 20, 2015 Depo.

MEMORANDUM DECISION AND ORDER

McDevitt at 24-26.)[2] Inside of the upper glove compartment both officers saw a small pill bottle and a semi-automatic pistol with a green frame.[3] Mr. Mandarino picked up the pill bottle and handed it to the Trooper who then passed it to Deputy Durflinger. Trooper McDevitt again ordered Mr. Mandarino to step out of the vehicle and stated: "You make any attempt to go towards that pistol and it will be the last thing that you do, okay?" (Dkt. 57 at ¶ 34, 35) (Dkt. 60 at ¶ 35.) The Trooper once again ordered Mr. Mandarino to exit the vehicle.

Mr. Mandarino then reached for the pistol. Trooper McDevitt yelled "No" and lunged toward the pistol. Both men grabbed the pistol simultaneously and a struggle ensued. While the two struggled, Deputy Durflinger had his firearm drawn and pointed at Mr. Mandarino from behind Trooper McDevitt. During their struggle over the gun, Trooper McDevitt commanded Mr. Mandarino to let go of the pistol several times. Trooper McDevitt then pushed the pistol away from him using one hand and unholstered his service weapon using his other hand. Trooper McDevitt placed the muzzle of his weapon against Mr. Mandarino's chest and told him to let go of the pistol. The two continued to struggle until Trooper McDevitt fired his weapon into Mr. Mandarino's chest. Trooper McDevitt then secured the pistol, holstered his own weapon, and moved Mr. Mandarino from the

2  The Plaintiffs' Statement of Facts states that Mr. Mandarino got into the passenger seat of the Scion and opened the upper glove box and handed the pill bottle containing marijuana to Trooper McDevitt at his "command." (Dkt. 57 at ¶ 33.) Defendants contend Mr. Mandarino did not immediately open the upper glove box but did so only after the Trooper asked him to produce the marijuana. (Dkt. 60 at 13.)

3  The facts regarding which way the pistol was pointing in the glove box are unclear. (Dkt. 57 at ¶ 34) (Dkt. 60 at ¶ 34.)

MEMORANDUM DECISION AND ORDER

Scion to the ground to begin first aid. Mr. Mandarino died from the shooting.

As a result of these events, the Plaintiffs filed the Complaint in this matter against Defendants Todd McDevitt, Adam Durflinger, and the Shoshone County Sheriff's Department. (Dkt. 1.)[4] The claims arise under 42 U.S.C. §§ 1983 and 1988 against the officers individually and the municipality alleging violations of Mr. Mandarino's civil rights under the Fourth and Fourteenth Amendments of the United States Constitution. (Dkt. 1.) Specifically, the right to Due Process, Equal Protection, and freedom from excessive and deadly force. The Defendants jointly filed the instant Motion for Summary Judgment seeking dismissal of all the claims raised in the Complaint and the Motion in Limine. (Dkt. 50, 51.)

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute…to require a jury or judge to resolve the parties' differing versions

---

4 The Plaintiffs are Laura Blankenship and LaMont Mandarino who are Co-Personal Representatives and the Legal Heirs of the Estate of Alexander L. Mandarino. (Dkt. 1.)

MEMORANDUM DECISION AND ORDER

of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); s*ee also British Motor Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a completely failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[5]

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

---

[5] *See also,* Rule 56(3) which provides, in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

MEMORANDUM DECISION AND ORDER

When applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States,* 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

**1.    Motion in Limine**

Defendants seek to exclude the expert testimony of Susan M. Peters as irrelevant and unreliable. (Dkt. 50.) Plaintiffs counter that Ms. Peters' opinions are proper non-scientific expert testimony that is routinely admitted in excessive force cases. (Dkt. 55.)

The Court may consider expert opinion testimony in ruling on a summary judgment motion so long as it contains facts that would be admissible at trial and the opinion is based on the expert's personal knowledge. In considering expert testimony, the Court has a "gatekeeping responsibility" to objectively screen such testimony to ensure that it "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–42 (1999). This obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (quoting *Kumho Tire supra*). Prior to considering proffered expert testimony, a trial court "must merely make a determination as to the proposed expert's qualifications." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994). A

MEMORANDUM DECISION AND ORDER

court is not to attempt to determine whether an expert's conclusions are correct, but rather examine only "the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). On a motion for summary judgment, the Court does not weigh the persuasiveness or credibility of an expert but, instead, only determines whether there is a genuine issue for trial.

## A.    Expert Qualifications

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.[6] Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (emphasis added). Moreover, "the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Id.*; see also Fed. R. Evid. 702 advisory committee's note ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). The Defendants do not, at least for purposes of this Motion, specifically challenge Ms. Peters' qualifications. (Dkt. 50, 62.) In order to satisfy its gatekeeping function, the Court has reviewed Ms. Peters' credentials and determined that,

---

6 Federal Rule of Evidence 702 states:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)    the testimony is based on sufficient facts or data;
(c)    the testimony is the product of reliable principles and methods; and
(d)    the expert has reliably applied the principles and methods to the facts of the case.

MEMORANDUM DECISION AND ORDER

for purposes of this Motion, her training, knowledge, experience, and education qualify her as an expert on custodial interrogation, vehicle search, and police practices. (Dkt. 50-1, Prelim. Expert Report of Peters and Ex. A.)

## B.    Relevant and Reliable

In addition to being qualified, the "[e]xpert testimony [must] be both relevant and reliable." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citations and quotations omitted). Relevancy "simply requires that the evidence...logically advance a material aspect of the party's case." *Id.* at 463 (citation and marks omitted). Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be admissible, evidence must also be relevant under Rule 402 and its probative value must not be substantially outweighed by the danger of unfair prejudice under Rule 403.

The reliability prong of Rule 702 requires that expert testimony be based on sound principles and methodology. The reasoning and methodology must be scientifically valid, and the court must assess whether it reasonably can be applied to the facts of the case. *United States v. W.R. Grace*, 455 F.Supp.2d 1148, 1152 (D. Mont. 2006). Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin*, 740 F.3d at 4683 (quoting *Kumho Tire*, 526 U.S. at 149 (citations and alterations omitted)). The Supreme

MEMORANDUM DECISION AND ORDER

Court has suggested several factors that courts can use in determining reliability: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *See Daubert*, 509 U.S. at 592–94. The Court is required to make some kind of reliability determination to fulfill its gatekeeping function.

In determining reliability, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, *Estate of Barabin*, 740 F.3d at 463 (citation omitted), and the analytical connection between the data, the methodology, and the expert's conclusions, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). Moreover, "the proponent of the expert ... has the burden of proving admissibility." *Cooper*, 510 F.3d at 942 (citation omitted); *see also Daubert II*, 43 F.3d at 1316 ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.").

MEMORANDUM DECISION AND ORDER

Courts are afforded "broad discretion" when determining whether an expert's testimony is reliable. *Hankey*, 203 F.3d at 1167-68. The reliability inquiry is flexible and trial judges have broad latitude to focus on the considerations relevant to a particular case. *Kumho Tire*, 526 U.S. at 150. Concerning the reliability of non-scientific testimony, the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hankey*, 203 F.3d at 1169 (emphasis added); *see also Kumho Tire*, 526 U.S. at 150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases.... In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.").

The Preliminary Expert Report (Report) provides Ms. Peters' opinions that: 1) the officers conducted a custodial interrogation without giving Mr. Mandarino *Miranda* warnings; 2) the officers conducted a search of the car without consent or a warrant; and 3) the officers' failure to follow basic police procedures caused Mr. Mandarino's death. (Dkt. 50-1, Peters Preliminary Report.) Ms. Peters has also compiled a Rebuttal Expert Report (Rebuttal Report) responding to the Preliminary Expert Report of John J. Ryan. (Dkt. 58-1, Peters Rebuttal Report.) Defendants challenge the relevance and reliability of each of these opinions and Reports. (Dkt. 50-2, 62.)

MEMORANDUM DECISION AND ORDER

Defendants contend that Ms. Peters' report and opinion are irrelevant and unreliable because she fails to opine regarding the degree of force used by the officers under the circumstances and, therefore, is irrelevant to the § 1983 claim against the officers in their individual capacities and makes comments on matters regarding persons or entities not a party to this action. (Dkt. 50 at 6-8.) Plaintiffs maintain Ms. Peters' opinions do not address matters outside of the Complaint and are relevant and reliable to the claims raised in this matter; arguing the Defendants' constitutional violations and lack of compliance with police procedure led to the use of excessive force. (Dkt. 55.)

### 1.    Matters Outside of the Complaint

Defendants argue Ms. Peters' comments regarding matters outside of the Complaint are not relevant. (Dkt. 50 at 8) (Dkt. 62 at 2.) In particular, contacts and communications between Plaintiffs' counsel and individuals and agencies not named as parties in this case and Deputy Durflinger's pre-employment history. For purposes of this Motion, the Court agrees that any opinions on matters outside of the claims and allegations raised in the Complaint are not relevant to the questions presented on summary judgment in this case. In that regard, the Motion in Limine is granted and the Court has not considered such materials. To the extent the Report discusses materials Ms. Peters used in formulating her opinion, however, such information is relevant to assessing the reliability of an opinion and the Court denies the Motion in Limine for that purpose.

MEMORANDUM DECISION AND ORDER

## 2.     *Miranda* and Custodial Interrogation Opinions

In general, expert testimony regarding police practices and procedures and the proper use of force is generally admissible in a § 1983 excessive force case as it is helpful to the jury. *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (holding a rational jury could rely upon expert testimony regarding the training of police dogs and police dog handlers to determine whether the officers' use of force was unreasonable); *Davis v. Mason Cnty*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) *superseded by statute on other grounds* (approving the testimony of plaintiffs' police practices expert that officers violated law enforcement standards). Defendants argue Ms. Peter's opinions fail to address police practices and standards as they relate and/or connect to the allegations in the Complaint, do not meet the standards of evidentiary relevance and reliability, and fails to reliably explain her incorrect conclusions concerning the lawfulness of the roadside investigation. (Dkt. 62.)

This Court has examined the extent of Ms. Peters' knowledge and experience based upon the information provided in her Preliminary Expert Report and Curriculum Vitae. (Dkt. 50-1.) The Court finds, for purposes of this Motion, that Ms. Peters' experience, training, and education provided a sufficient foundation of reliability for her testimony. Ms. Peters has twenty-nine years of law enforcement service and has worked as a police practices expert for nearly five years. During her career she has attained educational degrees; completed various training courses; and gained experience in the area of law

enforcement investigations as well as police practices and procedures. (Dkt. 50-1, Peters Curriculum Vitae, Ex. A.)

Defendants challenge the Report's conclusions regarding *Miranda* warnings and Custodial Interrogation are irrelevant and unreliable, apply the incorrect standard of law, and are based on speculation. (Dkt. 50.) Plaintiffs maintain Ms. Peters' opinions are relevant and reliable to their § 1983 excessive force claims concerning the reasonableness of the officers' conduct relative to the totality of the circumstances. (Dkt. 55.)

Ms. Peters' opinions regarding excessive force and police practices relate, in particular, to whether the officers provoked the escalation of the events resulting in the shooting and whether the officers acted reasonably under the totality of the circumstances. Those opinions are relevant to the issues presented on the Motion for Summary Judgment and, therefore, the Court has considered the same for purposes of ruling on the Motion for Summary Judgment.[7]  The Motion in Limine is denied in this respect.

**2.     Motion for Summary Judgment**

Title 42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting

---

[7] The Court makes no ruling at this time as to the admissibility of Ms. Peters' opinions and/or testimony for any purpose other than the Motion for Summary Judgment.

MEMORANDUM DECISION AND ORDER

under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

### A.    Excessive Force Claim

Claims of excessive force arising during or in the course of an arrest or other seizure implicate an individual's Fourth Amendment rights and, therefore, are analyzed under the reasonableness test of the Fourth Amendment balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Ninth Circuit applies *Graham* using a three-step analysis to determine whether or not the law enforcement officers used of force was reasonable. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (*en banc*)).

First, the Court considers the "nature and quality of the alleged intrusion." *Id.*; *see also Miller v. Clark Cnty*, 340 F.3d 959, 964 (9th Cir. 2003). Second, the Court analyzes the countervailing governmental interests at stake by looking at the three *Graham* factors: (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the Court examines the totality of the circumstances and considers whatever specific factors, beyond the *Graham* factors, that are appropriate in a particular case to determine whether the force employed was constitutionally reasonable. *Id.* at 964; *see also Franklin v. Foxworth*, 31 F.3d 873, 876

MEMORANDUM DECISION AND ORDER

(9th Cir. 1994) (stating the "inquiry is not limited to the specific *Graham* factors, ... [the court] must look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, and then must consider whether the totality of the circumstances justifies a particular sort of seizure.") (citation and quotations omitted).

This reasonableness balancing inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom […] summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Coles*, 704 F.3d at 627 (citations omitted). Summary judgment is appropriate on an excessive force claim if the Court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Graham*, 490 U.S. at 397 ("whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Alternatively, "the court may make a determination as to reasonableness where, viewing the evidence in the light most favorable to [the plaintiff], the evidence compels the conclusion that [the officers'] use of force was reasonable." *Hopkins v. Andaya*, 958 F.3d 881, 885 (9th Cir. 1992). The Court can therefore find summary judgment if the force the officers used was appropriate in any circumstance, or if the circumstances in the specific case were such that the only conclusion is that the force was reasonable. In this case, the Court has resolved any disputed facts in favor of the Plaintiff

MEMORANDUM DECISION AND ORDER

and viewed the evidence in the light most favorable to the Plaintiffs in determining whether the officers' use of force was reasonable.

While considering this question the Court is cognizant that "all determinations of unreasonable force must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396-97) (internal quotations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In addition, a plaintiff can succeed on an excessive force claim only if they have suffered some compensable injury as a result of their treatment. *Id.* at 394.

### (1)    Evaluating the Quantum of Force

In considering the nature and quality of the intrusion on the individual's Fourth Amendment interests, the Court evaluates the type and amount of the actual force used to determine if it was objectively reasonable. *See Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (quoting *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000) (The Court must "first assess the quantum of force used to arrest [the plaintiff] by considering the 'type and amount of force inflicted.'"). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of

MEMORANDUM DECISION AND ORDER

force constitutional." *Graham*, 490 U.S. at 397. It is the actual force used against Mr. Mandarino that must be considered regardless of the intentions of the officers during the event. The force use in this case was deadly force which is a significant intrusion on Mr. Mandarino's Fourth Amendment interests.

(2)  <strong>Applying the <em>Graham</em> Factors</strong>

The Court next considers the countervailing governmental interests at stake by evaluating (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle*, 272 F.3d at 1280 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440-41 (9th Cir. 1994)).

(a)  <strong>Severity of the Crime</strong>

Deputy Durflinger responded initially to investigate the report of a possible auto accident. That investigation revealed minor traffic infractions involving display of fictitious license plates, driver's license suspension, and confusion over the vehicle's registration and owner. As the officers investigated further into the matter, their suspicions heightened eventually leading both officers to suspect Mr. Mandarino of the more serious crime of trafficking marijuana. (Dkt. 51-4, Aff. Durflinger at ¶ 30) (Dkt. 51-3, Aff. McDevitt at ¶¶ 22, 25, 34.)

MEMORANDUM DECISION AND ORDER

(b)        **Immediate Threat**

The "most important *Graham* factor is whether the person posed an immediate threat to the safety of the officers or others." *Coles*, 704 F.3d at 629 (quoting *Mattos*, 661 F.3d at 441). A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective facts to justify such a concern." *Deorle*, 272 F.3d at 1281. "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,'" and a warning has been given where feasible. *Scott*, 39 F.3d at 914 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)) (emphasis in original). We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. In the context of summary judgment, the Court resolves any disputed factual issue in favor of Plaintiffs and draws all reasonable inferences in their favor, and view the facts "from the perspective of a reasonable officer on the scene." *Id*.

Viewing the totality of the circumstances in this case, the Court finds Trooper McDevitt reasonably believed that Mr. Mandarino posed an immediate threat of significant bodily harm to both himself as well as Deputy Durflinger. The initial contact and much of the exchange between the officers and Mr. Mandarino appears to be a fairly mundane investigation into the report of a vehicle off the road and standard vehicle licensing and registration checks. These routine checks, however, uncovered registration and licensing

MEMORANDUM DECISION AND ORDER

discrepancies as well as driving violations. Mr. Mandarino's contradicting and changing explanations for these discrepancies prompted the officers to investigate further which heightened the officers' suspicions and the tensions of the situation. Circumstances changed immediately once the officers saw the pistol in the upper glove compartment. At that point the tone of the exchange quickly shifted and rapidly evolved. In a matter of seconds, the scene went from Trooper McDevitt warning Mr. Mandarino to not reach for the pistol to the Trooper making a split-second decision to lunge towards the pistol, struggle for possession of the pistol, and ultimately to use his own weapon to counteract the significant threat of death or serious physical injury Mr. Mandarino posed to himself and Deputy Durflinger. Given the circumstances of Mr. Mandarino reaching for the pistol after the Trooper had expressly told him not to and his failure to release the pistol during the struggle despite the Trooper's commands, it was reasonable for Trooper McDevitt to believe that Mr. Mandarino posed a significant threat of death or serious physical injury to himself and Deputy Durflinger.

### (c)    Resisting Arrest or Flight

The third *Graham* factor asks whether Mr. Mandarino was "actively resisting arrest or attempting to evade arrest by flight" and whether "any other exigent circumstances ... existed at the time of the arrest." *Coles*, 704 F.3d at 629 (quoting *Deorle*, 272 F.3d at 1280).

MEMORANDUM DECISION AND ORDER

Most of the interactions between the officers and Mr. Mandarino prior to the shooting were cordial. While Mr. Mandarino gave inconsistent statements and was unable to explain the discrepancies with the vehicle's registration and license plates, Mr. Mandarino did not resist arrest or attempt to flee leading up to the shooting. Immediately prior to the shooting, however, Mr. Mandarino did not comply with Trooper McDevitt's directions that he step away from the vehicle. At this point, Mr. Mandarino was not actively resisting Trooper McDevitt's commands but, instead, passively failed to exit and step away from the Scion. *Coles*, 704 F.3d at 629-30 ("[W]e have drawn a distinction between passive and active resistance, and failing to exit a vehicle is not active resistance") (citing cases).

After Trooper McDevitt asked him to produce the marijuana, Mr. Mandarino opened the upper glove compartment where the pill bottle and pistol were located. Mr. Mandarino handed the pill bottle containing marijuana to Trooper McDevitt. Trooper McDevitt then warned Mr. Mandarino to not reach for or go near the pistol.[8] When Mr. Mandarino reached for the pistol, Trooper McDevitt lunged for the pistol and the two can be heard struggling over possession of the weapon. During the struggle, Trooper McDevitt

---

8 The parties dispute whether Mr. Mandarino heard, understood, and/or was confused by Trooper McDevitt's warning. (Dkt. 57 at ¶ 34) ("[Mr. Mandarino] can be heard responding with surprise.") (Dkt. 57 at ¶ 35) (Dkt. 60 at ¶ 34) (disputing the inference that Mr. Mandarino reacted with "surprise.") This dispute does not give rise to a genuine issue of material fact because the undisputed facts show that Mr. Mandarino reached for the pistol and failed to "let go" at Trooper McDevitt's repeated commands. Even if Mr. Mandarino was initially confused about the Trooper's warning to not reach for the pistol, the undisputed facts show that Mr. Mandarino did not release the pistol as ordered by the Trooper and physically struggled with the Trooper over control of the pistol.

MEMORANDUM DECISION AND ORDER

gave repeated commands to Mr. Mandarino to let go of the gun. At this point, Mr. Mandarino was actively resisting Trooper McDevitt's commands to let go of the pistol.

### (3)    Consideration of the Totality of the Circumstances

Because the touchstone of the Fourth Amendment is reasonableness and there is no mechanical test that will capture all of the relevant factors to determine whether a given use of force is excessive, the Court must also consider the totality of the circumstances which can include such factors as alternative levels of force, warnings, the existence of probable cause, and/or whether the officers complied with department guidelines. *Brooks v. Clark Cnty.*, 828 F.3d 910, 919 (9th Cir. 2016); *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted). Again, the inquiry is whether the force that was used to was reasonable, viewing the facts from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396.

### i)    Warnings and Alternative Levels of Force

While police officers "are not required to use the least intrusive degree of force possible," it is appropriate to consider what their options were, if any, in a given situation. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). In this case, Trooper McDevitt gave Mr. Mandarino a clear verbal warning to not move towards the pistol. When Mr. Mandarino reached for the pistol, Trooper McDevitt repeatedly commanded Mr. Mandarino to let go of the pistol and attempted to physically wrestle the pistol from Mr. Mandarino before the Trooper resorted to using his own firearm.

MEMORANDUM DECISION AND ORDER

### ii)      Pre-Shooting Conduct

Plaintiffs argue the totality of the circumstances in this case should not be limited to the exact moment of the shooting. (Dkt. 56 at 12-13.) Instead, Plaintiffs assert, the Court should consider the pre-shooting conduct which includes the minor nature of the crimes, Mr. Mandarino's unthreatening conduct for the majority of the detention, and the officers' violation of police policy and standards with regard to custodial interrogation. (Dkt. 56 at 11-14.) The Court has considered the pre-shooting events in this case as stated throughout this Order. Even if the initial traffic infractions were minor, Mr. Mandarino was non-threatening and compliant for the first forty minutes of the encounter, the officers failed to observe police procedures, and/or the officers violated certain constitutional requirements relating to detentions and searches, the Court still finds the officers' actions were reasonable for the reasons articulated herein.

### (4)      Balancing the Interests

In balancing the gravity of the intrusion on Mr. Mandarino against the government's need for that intrusion, the Court finds the balance to be in favor of the government. *Miller*, 340 F.3d at 964. Viewing any discrepancies and facts in the light most favorable to the Plaintiffs, the Court finds Trooper McDevitt's use of force against Mr. Mandarino was reasonable as a matter of law. While the stop initially involved only minor traffic infractions and the majority of the encounter was non-threatening to all of the individuals present, the officers' investigation uncovered a reasonable suspicion that Mr. Mandarino

MEMORANDUM DECISION AND ORDER

was trafficking marijuana. When confronted by the officers concerning the marijuana, Mr. Mandarino began failing to comply with the officers' direction that he move away from the vehicle. Ultimately, Mr. Mandarino opened the upper glove compartment of the vehicle revealing the pistol. Mr. Mandarino then reached for the weapon despite Trooper McDevitt's verbal commands that he not move toward the pistol presenting a very serious and real threat to both officers. Mr. Mandarino then engaged in a physical struggle with Trooper McDevitt over possession of the firearm and refused to comply with Trooper McDevitt's orders that he "let go" of the pistol all of which further elevated the risk of death or serious bodily injury to everyone present at the scene. The Court finds, under these circumstances, the officers' use of force was reasonable and did not violate Mr. Mandarino's constitutional rights.

**B.  Constitutional Violations**

Plaintiffs claim the officers subjected Mr. Mandarino to custodial interrogation without advising him of his *Miranda* rights in violation of the Fifth Amendment right against self-incrimination. *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). Therefore, a violation of one's *Miranda* rights, standing alone, cannot form a basis for liability under § 1983. *Chavez v. Martinez*, 538 U.S. 760, 767, 770 (2003) ("[F]ailure to read Miranda warnings does not violate [a citizen's] constitutional rights and cannot be

MEMORANDUM DECISION AND ORDER

grounds for a § 1983 action."). Accordingly, to the extent the Plaintiffs' § 1983 claims are based on the Fifth Amendment, those claims fail as a matter of law and summary judgment is granted in this regard.

Plaintiffs recognize the holding in *Chavez* but argue the lack of *Miranda* warnings should be considered as part of the totality of the circumstances for purposes of the reasonableness determination with regard to the officer's conduct and the duration of the detention. (Dkt. 56 at 11 n. 1.) Essentially, Plaintiffs argue, the officers violated Mr. Mandarino's Fourth Amendment rights during the custodial interrogation by failing to arrest him or read the *Miranda* warnings earlier in the detention which would have prevented the escalation of the situation and the resulting shooting. This argument couples with the Plaintiffs' expert report and arguments applying the provocation doctrine and violations of police policies and standards; i.e., that the officers' continued questioning after they had decided they were going to arrest Mr. Mandarino unlawfully prolonged the stop, violated police policy and procedures, and escalated the situation creating the circumstances resulting in the use of deadly force. (Dkt. 56 at 12.) The Court disagrees.

Deputy Durflinger lawfully approached Mr. Mandarino's vehicle to investigate the report of a possible accident. When dispatch returned the false license plates, the Deputy was justified in further initiating contact with Mr. Mandarino to investigate the possibility of a traffic violation. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Miranda–Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006) ("An investigatory stop of a

MEMORANDUM DECISION AND ORDER

vehicle is reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic violation has occurred."). From that point on, the questioning of Mr. Mandarino by both Deputy Durflinger and Trooper McDevitt was lawful as the totality of circumstances gave rise to reasonable suspicion that further criminal activity was afoot. An officer may ask questions which prolong a traffic stop if there is reasonable suspicion of criminal activity, *United States v. Turvin*, 517 F.3d 1097, 1100-01 (9th Cir. 2008), or if "new grounds for suspicion of criminal activity continue[ ] to unfold." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005). The circumstances in this case gave rise to reasonable suspicion justifying the officers' further questioning and investigation. In particular, the report from dispatch regarding the false license plates, the initial lack of any vehicle registration, the smell of marijuana, and Mr. Mandarino's suspended license. Additionally, Mr. Mandarino gave several inconsistent and contradicting responses to the officers' questions regarding the license plates, the owner of the vehicle, and his route of travel. The officers reasonably and diligently investigated their suspicions by inquiring of Mr. Mandarino directly, observing the scene, and using dispatch to verify or obtain information.

Although the officers could have arrested Mr. Mandarino sooner, they were not required to do so. Neither drivers nor passengers "'ha[ve] a right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, ha[ve] been completed.'" *Turvin*, 517 F.3d 1097, 1103 (9th Cir. 2008) (quoting *United*

MEMORANDUM DECISION AND ORDER

*States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002)). The fact that this encounter lasted over forty minutes is relevant but not dispositive of the issue. *See Mayo*, 394 F.3d at 1276 (stating there is no strict time requirement for the duration of a stop) (citing cases). Again, because the totality of the circumstances in this case gave rise to a reasonable suspicion of criminal activity, the officers' investigation and questioning of Mr. Mandarino was lawful.

Even if the officers did violate Mr. Mandarino's constitutional rights during their investigation, the Court finds any such violation did not provoke or result in the shooting.

## C.    Provocation Doctrine

Even if the force used was reasonable, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) (citing *Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355 (9th Cir. 1994)). If, however, an officer's pre-shooting conduct negligently provokes a suspect to violence, "that negligent conduct will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation." *Id.* at 1190. A plaintiff cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id.* at 1190-91 (finding officer had not intentionally or recklessly provoked confrontation with decedent where officer failed to wait for "backup [to] arrive"); *George v. Morris*, 736 F.3d 829, 839 n.14 (9th Cir. 2013) (rejecting plaintiff's arguments that deputies had violated Fourth

MEMORANDUM DECISION AND ORDER

Amendment by not "gathering intelligence...before heading to the backyard" where decedent was located and by "failing to set up a non-confrontational, soft perimeter around the house"; finding "[a]t most, [such] failings amount to negligence"). The provocation doctrine does not "indicate that liability may attach only if the plaintiff acts violently; we simply require that the deputies' unconstitutional conduct 'created a situation which led to the shooting and required the officers to use force that might have otherwise been reasonable.'" *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1193 (9th Cir. 2016) (quoting *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 539 (9th Cir. 2010)).

Plaintiffs argue genuine issues of material fact exist here concerning whether the officers' violation of Mr. Mandarino's constitutional rights prior to the display of the pistol caused the escalation of the situation leading to the shooting. (Dkt. 56 at 7.) The Court disagrees.

Plaintiffs fail to point to evidence showing the officers in this case intentionally or recklessly provoked the situation leading to Mr. Mandarino reaching for the pistol and engaging in a struggle over the weapon with Trooper McDevitt that resulted in the shooting. [9] As determined above, the officers' questioning and investigation was reasonable and lawful. Even if the officers were determined to have violated certain constitutional protections during their investigation, those violations did not provoke the

---

9 Ms. Peters' opinions generally conclude that the officers' prolonged investigation and failure to follow police procedure "escalated the situation" and had the officers followed procedures officers there would not have been a shooting. (Dkt. 50-1.) For the reasons stated herein, the Court concludes that Ms. Peters' report does not show the existence of a genuine issue of material fact in this case.

MEMORANDUM DECISION AND ORDER

escalation of the situation resulting in the shooting. The manner in which the officers pursued their investigation was non-threatening and diligently directed towards resolving their reasonable suspicions over the questions concerning the registration and licensing of the Scion, Mr. Mandarino's suspended license, and the odor of marijuana.

As the officers began to question Mr. Mandarino about the smell of marijuana and directing that he step away from the Scion, however, Mr. Mandarino became less cooperative. The officers repeated their commands but Mr. Mandarino did not comply. Instead of moving away from the vehicle, Mr. Mandarino sat down in the passenger seat. Ultimately Mr. Mandarino opened the upper glove compartment which contained the pill bottle and pistol. Once the pistol was displayed, the tenor of the scene changed rapidly to a tense situation. Trooper McDevitt warned Mr. Mandarino to not go towards the pistol and then struggled with Mr. Mandarino for possession of the pistol while repeatedly directing Mr. Mandarino to let go of the pistol. Those events ultimately led to Trooper McDevitt shooting Mr. Mandarino. Under these circumstances, the Court finds the officers' conduct did not intentionally or recklessly provoked and/or escalated the situation leading to the shooting.

### D.    Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S.

MEMORANDUM DECISION AND ORDER

223, 231 (2009) (quoting *Harlow v, Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). A negative answer to either question means that immunity from monetary damages claims is appropriate. *See Pearson*, 555 U.S. at 236. Courts have discretion over which of the two-prongs to decide first. *Id.*

The first prong asks whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. But if there appears to have been a constitutional violation, the court must determine whether the constitutional right in question was "clearly established." *Id.* If the right is not clearly established, then the officer is entitled to qualified immunity.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the

MEMORANDUM DECISION AND ORDER

specific context of the case, not as a broad general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

It is clearly established that an individual has a right to be free from excessive force and that "force is only justified when there is a need for force." *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007); *Graham*, 490 U.S. at 394–95 (right to be free from use of excessive force during an arrest, investigatory stop or other seizure of a free citizen arises under the Fourth Amendment). Whether or not the officers' actions were reasonable often depends on the jury's resolution of disputed facts. Here, however, the definitive events of June 12, 2013 are not in dispute. There is no dispute that a pistol was in the upper glove box of the Scion, Mr. Mandarino reached for the pistol after being told not to do so by Trooper McDevitt, a struggle ensued between Trooper McDevitt and Mr. Mandarino during which the Trooper gave repeated commands to Mr. Mandarino that he let go of the pistol. Ultimately, Trooper McDevitt fired his weapon into Mr. Mandarino's chest causing his death.

Again, viewing the facts and drawing reasonable inferences in the light most favorable to the Plaintiffs, the Court concludes the officers did not violate Mr. Mandarino's constitutional rights and, therefore, the officers are entitled to qualified immunity. *Pearson*, 555 U.S. at 232-33.

MEMORANDUM DECISION AND ORDER

### E.   Municipal Liability

Plaintiffs also seek damages against the SCSO. The Supreme Court has held in *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658 (1978) that "local governing bodies […] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where […] the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decisions officially adopted and promulgated by that body's officers." *Id.* at 690. To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. #40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). In order to survive summary judgment on a claim of liability based on failure to train or supervise, a plaintiff must provide evidence indicating what training practices were employed by the municipality at the time of the alleged constitutional violation or what type of constitutionally-mandated training was lacking. *See Waggy v. Spokane Cnty.*, 594 F.3d 707, 713-14 (9th Cir. 2010).

Where, as here, there is no constitutional violation by the officers, there can be no municipal liability. The Supreme Court has held that no principle "authorizes the award of damages against a municipal corporation when […] the officer inflicted no constitutional

MEMORANDUM DECISION AND ORDER

harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). This rule applies regardless of the actual policies of the municipality. *Id*. ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original). Because no constitutional violation occurred, summary judgment is granted as to the claim against SCSO.

Even if a constitutional violation had occurred, the Court would still find the SCSO is immune from the excessive force claim as the Plaintiffs have failed to bring forward any evidence of the existence of a custom or policy that led to constitutional violations. In order to hold a municipality liable Plaintiffs must show evidence "that a constitutional deprivation was directly caused by a municipal policy." *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir. 2001) (citations omitted). It is Plaintiffs' burden to show a policy or custom on the part of the SCSO which can be proven by the municipality's negligence in training or failure to respond to constitutional violations. *Gilette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992). Plaintiffs have offered no evidence that such a policy or custom exists beyond the conclusory allegations in the Complaint. (Dkt. 1.)

For these reasons, the Motion for Summary Judgment is granted as to the claim against SCSO.

MEMORANDUM DECISION AND ORDER

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)      Defendants' Motion in Limine (Dkt. 50) is **GRANTED IN PART AND DENIED IN PART** as stated herein.

2)      Defendants' Motion for Summary Judgment (Dkt. 51) is **GRANTED**.

DATED: September 29, 2016

Edward J. Lodge
United States District Judge

MEMORANDUM DECISION AND ORDER